UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION


LOISE L. GUNN,                              )
                                           )
                    Plaintiff,             )
                                           )
        v.                                 )          No. 2:14CV20 SPM
                                           )
CAROLYN W. COLVIN, Acting                  )
Commissioner of Social Security,           )
                                           )
                    Defendant.             )


## MEMORANDUM AND ORDER

Plaintiff Loise L. Gunn brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the Commissioner's final decision denying her

application for disability insurance benefits (DIB) under Title II of the Social

Security Act, 42 U.S.C. §§ 401, *et seq.*, and application for Supplemental Security

Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters

are pending before the undersigned United States Magistrate Judge, with consent

of the parties, pursuant to 28 U.S.C. § 636(c).  Because the final decision is not

supported by substantial evidence on the record as a whole, this case will be

reversed and remanded for further proceedings.

## I. PROCEDURAL HISTORY

On May 31, 2011, the Social Security Administration denied plaintiff's

March 2011 applications for DIB and SSI, in which she claimed she became disabled on February 2, 2011, because of neck pain, a heart condition, and bulging discs in her back. (Tr. 78-79, 83-88, 154-68, 195.) At plaintiff's request, a hearing was held before an administrative law judge (ALJ) on September 21, 2012, at which plaintiff and a vocational expert testified. (Tr. 28-62.) On November 5, 2012, the ALJ issued a decision denying plaintiff's claims for benefits, finding plaintiff able to perform her past relevant work as well as other work as it exists in significant numbers in the national economy. (Tr. 7-23.) On December 31, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. FACTUAL BACKGROUND

At the time of the hearing before the ALJ, plaintiff was forty-seven years of age, married and living in a trailer with her husband. (Tr. 33-34.) Plaintiff testified that she does not read very well but can read simple things. (Tr. 35-36.) Indeed, the record shows that Plaintiff graduated from high school but attended special education classes throughout her education. When Plaintiff was eighteen years old, she underwent diagnostic testing which showed her to be a slow learner with significant deficits, with specific problems noted in short-term auditory memory, short-term auditory sequential memory, auditory synthesis, auditory

- 2 -

discrimination, symbol manipulation, conceptual flexibility, and numerical facility and reasoning. At the time of this diagnostic testing, among other limitations, plaintiff's reading skills were at the third grade level and her spelling at the fourth grade level. Her measured intellectual performance was within the low average range, with plaintiff's verbal IQ measured to be 80, performance IQ measured to be 97, and full scale IQ measured to be 86. (Tr. 265-309.)

Plaintiff's Work History Report shows that plaintiff worked in a nursing home as a housekeeper from 1993 to 2004. In 2004, plaintiff worked as a lineman in a pig factory; and in 2005 and 2006, she worked as a lineman in a uniform company. From August 2006 to February 27, 2011, plaintiff worked as a dietary aide. (Tr. 203.) Plaintiff testified that she stopped working in February 2011 because of back pain. (Tr. 36.)

## A. Plaintiff's Back Pain

Plaintiff testified that she first experienced back pain in February 2011 and that the pain currently limits her ability to move, lift, walk, sit, and stand. (Tr. 36-37, 43.) Plaintiff testified that her back pain interferes with sleep in that she must get up in the middle of the night to sit in a chair. She gets about four or five hours of sleep at night. (Tr. 48.) Plaintiff testified that she has received steroid injections but has not participated in physical therapy because she cannot afford it. (Tr. 39.) Plaintiff's medical records reflect that on February 11, 2011, she went to

the emergency room complaining of sharp back pain radiating to both legs.
Plaintiff reported that she injured her back two weeks prior and that the current
pain came on at work while she was pushing a food cart. Physical examination
showed muscle spasm, tenderness, and decreased range of motion. Otherwise,
physical examination was normal in all respects. Plaintiff was given Toradol and
was discharged to home that same date in improved condition. She was prescribed
Vicodin and Flexeril. (Tr. 348-53.)

About two weeks later, plaintiff followed up with Dr. Jeffrey Parker, an
orthopaedic specialist at the Columbia Orthopaedic Group who had previously
treated plaintiff for issues related to her neck. (Tr. 331 & 420). Plaintiff reported
that she was not "having any major neck issues" but was there for a "new problem
with pain in her back and left leg." *Id.* Examination showed plaintiff to be in no
acute distress. She walked with a normal gait and was able to heel and toe walk
without difficulty. However, plaintiff had painful motion about the lumbar spine,
and tenderness was noted over the lumbar paraspinals. A CT scan revealed central
disc bulges including one that was "fairly heavily calcified." *Id.* Dr. Parker
instructed plaintiff to remain off of work until the following week and ordered an
epidural steroid injection. *Id.* (Tr. 331.)

**B.    Plaintiff's Neck Pain/Stiffness**

At the hearing before the ALJ, plaintiff testified that she has constant pain in

her neck and has difficulty turning her neck. (Tr. 45-46.) Plaintiff testified that she turns her body to look in different directions. (Tr. 52.) Plaintiff testified that her neck condition affects her ability to reach above her head because she cannot look up. (Tr. 48.) Plaintiff also cannot look down and holds things out in front of her to see them. Plaintiff has had steroid injections and takes Vicodin, which helps ease the pain. (Tr. 39, 52.)

Plaintiff's medical records reflect that beginning in October 2010, she was treated for severe neck stiffness that had gradually worsened over the past year. (Tr. 330.) An x-ray was taken that showed suspected diffuse idiopathic skeletal hyperostosis or DISH. The x-ray revealed very large spondylolytic spurs involving the first, second, third, fourth, fifth, sixth and seventh cervical vertebrae. In addition, the fourth, fifth, sixth and seventh cervical vertebrae were ankylosed which, in the opinion of the reviewing doctor, "should cause marked limitation in range of motion." (Tr. 354.)

Plaintiff visited Dr. Jeffrey Parker at the Columbia Orthopaedic Group on October 29, 2010 for follow up treatment. Plaintiff reported having some pain with the condition, but not a lot. Plaintiff had no numbness or weakness and no complaints regarding her extremities. Physical examination showed plaintiff's neck to have extremely poor rotation, noted to be about twenty percent of normal. Flexion and extension was slightly better. Dr. Parker noted the recent x-ray which

showed extensive bony osteophytes across the front of plaintiff's neck at essentially every disc level was consistent with DISH. Dr. Parker diagnosed plaintiff with probable DISH involving the cervical spine and ordered an MRI. (Tr. 416-17.)

Plaintiff underwent an MRI on November 19, 2010, which showed prominent disc bulge with cephalad extrusion of contents, resulting in some mild canal and bilateral neural foraminal stenosis at the C3-4 level. Shallow bulging was also noted at C4-5 and, to a lesser extent, C7-T1. (Tr. 414.) Plaintiff complained to Dr. Parker that her neck continued to be sore and very stiff. Upon review of the MRI, Dr. Parker diagnosed probable cervical spondylosis secondary to DISH. Noting there to be no evidence of nerve root or spinal cord compression, Dr. Parker recommended an epidural injection and advised plaintiff to participate in physical therapy for cervical strengthening and range of motion. Dr. Parker noted were no "surgical options for her which would improve her range of motion." (Tr. 415.) An epidural injection of Kenalog and Omnipaque was administered that same date. (Tr. 422-23.)

### C. Plaintiff's Other Impairments

In addition to the foregoing ailments, Plaintiff testified, and the medical records reflect, that she underwent heart surgery in 2010 which she claims causes shortness of breath with activity. (Tr. 42-43.) Plaintiff further testified that she has

diabetes and that she sometimes experiences headaches and dizziness when her blood sugar level is too high.  (Tr. 44.)  Finally, Plaintiff suffered a stroke in September 2012 for which she underwent surgery.  Plaintiff testified that she continues to have residual difficulty with eating, talking, writing, and her memory.  Plaintiff also continues to experience numbness in her right leg and uses a cane to help with balance.  (Tr. 39-41, 46.)

Plaintiff testified that as a result of her various impairments she can sit for approximately thirty minutes and can stand for one or two hours.  Plaintiff testified that her ability to stand was recently limited because of her stroke.  Plaintiff has difficulty bending and can lift only five pounds.  (Tr. 43-44.) As to her daily activities, plaintiff testified that she has no difficulties with personal care.  She cooks and does household chores—such as dishes, sweeping, and mopping—for limited periods of time.  Plaintiff does the laundry but does not lift the laundry basket.  Plaintiff goes grocery shopping once a week for thirty minutes to an hour.  (Tr. 48-50.)  She has a driver's license but has not driven since her stroke in 2012.  (Tr. 34.)  Plaintiff visits her mother a couple of times a week.  She does not attend church, go to movies, or go out for dinner.  Plaintiff testified that she did cross-stitch embroidery three or four times a week for thirty minutes at a time prior to her stroke.  (Tr. 50-51.)

**D.     The Vocational Expert's Testimony**

Vocational expert, Carly Coughlin, also testified at the hearing before the ALJ. Ms. Coughlin classified plaintiff's past work as a dietary aide as medium with an SVP level of 2; as a housekeeper as medium with an SVP level of 3; as a sewing machine operator as light with an SVP level of 3; and as a production worker/lineman at the pig factory as medium, light as performed, with an SVP level of 2.  (Tr. 54-55.)[1]

Ms. Coughlin testified that a person of plaintiff's age, work history and education history who is limited to light work and further limited to lifting/carrying ten pounds; limited to "only occasionally" climbing ramps or stairs; limited to never climbing ladders, ropes, or scaffolds; limited to only occasionally balancing, stooping, kneeling, crouching, or crawling; must avoid concentrated exposure to vibration and temperature extremes; and is limited to "simple, routine, repetitive work"  could perform plaintiff's past work as a production worker/lineman in a pig factory, as it was performed by plaintiff. (Tr. 55.)  Ms. Coughlin further testified

---

[1] In her Work History Report dated April 2011, Plaintiff reported that as a lineman at a pig factory she worked as a membrane skinner eight hours a day, five days a week. In that capacity, Plaintiff used machines, tools, or equipment as well as technical knowledge or skills; she did not engage in any writing, complete reports, or perform similar duties; she was at her station all day and her responsibilities included picking up meat from the line, rolling it onto the skinner, and then putting it on the table.  As membrane skinner Plaintiff frequently lifted less than ten pounds and lifted no weight greater than ten pounds.  Plaintiff reported that for eight hours of her workday she would stand; reach; handle, grab, or grasp big objects; and handle small objects. Plaintiff reported not having to walk, sit, climb, stoop, kneel, crouch, or crawl with this job.  (Tr. 203, 207.)

that such a person could also perform work as a nut sorter, of which 1,000 such jobs exist in the State of Missouri and 13,000 nationally; assembler, of which 1,300 such jobs exist in the State of Missouri and 28,000 nationally; and order clerk, of which 27 such jobs exist in the State of Missouri and 1,084 nationally. (Tr. 55-56.)

Ms. Coughlin also testified that an individual who had the same restrictions described above, but who also needed to alternate between sitting, standing, and walking at least every forty-five minutes; and was further restricted in looking up, down, and to the sides to only thirty degrees in each direction because of a limited range of motion about the neck, could not perform any of the work she previously identified. Specifically, Ms. Coughlin testified that the limited neck motion precluded work in the production occupations and that the requirement for alternating positions precluded work as an order clerk. (Tr. 56.)

Ms. Coughlin testified, however, that such a person could perform work as an election clerk/call clerk, a pari-mutuel ticket checker, and a surveillance system monitor. Ms. Coughlin testified that jobs such as order clerk and election clerk require language development at a fourth through sixth grade level and jobs such as pari-mutuel ticket checker and surveillance system monitor require language development at a seventh through eighth grade level. (Tr. 57-58.) Ms. Coughlin testified that the number of available jobs would be significantly reduced if the

individual was markedly limited in short-term auditory memory. (Tr. 60-61.)

## III. STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a plaintiff must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(C).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step

process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step Four, the Commissioner determines whether the claimant can return to his past

relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV. THE ALJ'S DECISION

Applying the foregoing disability analysis, the ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2015, and had not engaged in substantial gainful activity since February 2, 2011,

the alleged onset date of disability. The ALJ found plaintiff's coronary artery disease, status post myocardial infarction with quintuple coronary artery bypass grafts, degenerative disc disease of the cervical and lumbar spine, and learning disability to be severe impairments, but found that they did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12-13.) The ALJ found plaintiff to have the RFC to perform light work except that she could only lift and carry ten pounds and could "occasionally climb ramps or stairs, and never climb ladders, ropes, or scaffolds. She may occasionally balance, stoop, kneel, crouch, or crawl. [She] must avoid concentrated exposure to vibration and temperature extremes. . . [and] is limited to simple, routine, and repetitive work." (Tr. 15.) The ALJ found vocational expert testimony supported a finding that plaintiff could perform her past relevant work as a lineman in a pig factory as she actually performed it. In the alternative, the ALJ found vocational expert testimony supported a finding that, with her age, education, work experience, and RFC, plaintiff could perform other work existing in significant numbers in the national economy, and specifically, nut sorter, assembler, and order clerk. The ALJ thus found that plaintiff was not under a disability from February 2, 2011, through the date of the decision. (Tr. 21-23.)

## V. DISCUSSION

In seeking judicial review of the ALJ's decision, Plaintiff's primary

argument is that, despite substantial evidence showing her to have significant limited range of motion about the neck, the ALJ failed to include any such limitation in her residual functional capacity (RFC) assessment. Plaintiff argues, among other things, that this faulty RFC assessment resulted in the ALJ's reliance on vocational expert testimony that was based upon a hypothetical not supported by substantial evidence. Plaintiff also contends that the ALJ erred by finding plaintiff's RFC to be compatible with the performance of her past relevant work and, further, that the combined effect of her physical and intellectual impairments precludes the performance of the other work described by the expert.

### A.    Standard for Judicial Review

The decision of the Commissioner must be affirmed if it "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)). In determining whether substantial evidence supports the Commissioner's decision, the court considers evidence that both supports and detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and

[it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. The ALJ's RFC Determination Is Not Supported By Substantial Evidence

Prior to Step Four of the disability analysis, the ALJ is required to determine Plaintiff's residual functional capacity (RFC). The RFC is defined as the most a claimant can do despite her limitations, and it includes an assessment of the claimant's physical abilities and mental impairments. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. *Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th

Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). Because a claimant's RFC is a medical question, some medical evidence of the plaintiff's ability to function in the workplace must support the ALJ's RFC determination. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Eichelberger*, 390 F.3d at 591; *Hutsell v. Massanari*, 259 F.3d 707, 711-12 (8th Cir. 2001). Under SSR 96-8p, in assessing a claimant's RFC, an ALJ should consider functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. 1996 WL 374184 at *1.

Here, there was substantial medical evidence of record establishing that plaintiff suffered from DISH, a medically determinable impairment that caused marked limitation in the range of motion in plaintiff's neck. Yet, the ALJ failed to include this functional limitation in the RFC assessment. The reasons given by the ALJ for this omission were that the "objective findings with regard to claimant's condition are inconsistent with the degree of limitations alleged;" the diagnostic imaging of plaintiff's cervical spine was outdated in that the last imaging occurred in October 2010; plaintiff failed to pursue physical therapy as a rehabilitative option; and plaintiff reported no extremity complaints, numbness or weakness at a doctor's visit on October 29, 2010. (Tr. 17.)

Citing to x-rays of plaintiff's cervical spine taken in October 2010 and a

single doctor's visit on October 29, 2010, the ALJ concluded that the objective findings were inconsistent with the degree of limitations claimed by the plaintiff. (Tr. 17.) However, the ALJ failed to explain why those findings were inconsistent with plaintiff's claimed limitations, and a review of the record reveals no such inconsistency. Indeed, the medical records show that in October 2010 plaintiff sought treatment for what she described as worsening neck stiffness throughout the previous year. An X-ray of plaintiff's cervical spine showed, among other things, "nearly complete ankyloses of the cervical spine due to arthritic spurs anteriorly. . . very large spondylolytic spurs involving the first, second, third, fourth, fifth, sixth and seventh cervical vertebrae." The physician interpreting the x-ray concluded that those findings "should cause marked limitation in range of motion." (Tr. 418.)

Dr. Parker, an orthopaedic specialist, subsequently examined plaintiff and objectively observed that plaintiff's neck had extremely poor rotation. Dr. Parker concluded plaintiff's neck rotation was about twenty percent of normal, though flexion and extension were slightly better.  In November 2010, Dr. Parker noted that plaintiff's neck was "globally stiff in rotation, flexion and extension."  Dr. Parker proposed epidural injections to help with the neck pain and cervical strengthening to address range of motion. Dr. Parker noted that there were no surgical options that would improve plaintiff's range of motion. (Tr. 415.)  Dr. Parker saw plaintiff again in February 2011 when she came in for treatment related

to her back. Although plaintiff indicated she was not "having any major neck issues," she also reported that "her neck pain is still not much better than it was when [Dr. Parker] saw her last." (Tr. 420.)

As the hearing decision correctly points out, the record contains no diagnostic imaging of plaintiff's cervical spine after 2010. However, there is nothing in the objective medical record to suggest that the condition of plaintiff's cervical spine somehow improved following the initial imaging. Nor does it appear that the ALJ requested a consultative examination to obtain a more current assessment of plaintiff's neck-related impairment. It is well settled that "the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (citing *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000); *Landess v. Weinberger*, 490 F.2d 1187, 1188 (8th Cir. 1974)). The ALJ's duty extends even to cases where the claimant is represented by an attorney at the administrative hearing. *Id.* (citing *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983)). To the extent the ALJ believed that the 2010 diagnostic imaging was no longer reflective of plaintiff's current level of impairment, the ALJ certainly had the ability and responsibility to order a consultative examination to assess the current state of plaintiff's neck condition. In the absence of any objective medical evidence that plaintiff's condition improved following Dr. Parker's initial assessment, it is not at

all clear what logical link or, more importantly, what substantial evidence supports the ALJ's conclusion that plaintiff had no functional limitations in her neck.

The Commissioner argues that the ALJ's decision is supported by evidence that plaintiff did not have pain even when she had stiffness in her neck and that plaintiff did not seek regular treatment for neck pain after the initial treatment in 2010. This argument misses the point. First, the evidence clearly shows that plaintiff had significant limitations in the range of motion around her neck even when she was reporting she had some pain but not a lot. Second, although the absence of documented complaints of pain or a dearth of evidence that plaintiff sought treatment for her condition may support the ALJ's credibility analysis, a conclusion regarding credibility is not the equivalent of medical evidence that supports the RFC. *See Estabrook v. Apfel,* 14 F. Supp. 2d 1115, 1122 (S.D. Iowa 1998); *Soth v. Shalala*, 827 F. Supp. 1415, 1417 (S.D. Iowa 1993).

The significance of plaintiff's neck limitation to her ability to function in the workplace was highlighted by the vocational expert's testimony at the hearing before the ALJ. In essence, the vocational expert testified that plaintiff would not be able to perform either her past relevant production work or the other production jobs of nut sorter or assembler if, in addition to the limitations described in the RFC, she was further restricted in looking up, down, and to the sides to only thirty degrees in each direction. (Tr. 56.)  The vocational expert explained that because

those production jobs "require looking down," a person with that level of limitation around the neck would be precluded from performing those jobs. *Id.*

In sum, in light of objective medical evidence that, as of 2010, plaintiff had significantly limited range of motion in her neck and in the absence of any medical evidence that plaintiff's neck condition improved over time, the ALJ's conclusion that plaintiff had no credible functional imitations in her neck is not supported by substantial evidence.

### C.    The ALJ's Error In Assessing Plaintiff's RFC Is Not Harmless

Although the ALJ concluded that plaintiff was not disabled at Step Four of the disability analysis, the ALJ also found, in the alternative, that plaintiff was not disabled at Step Five of the disability analysis. Indeed, pursuant to the vocational expert's testimony, even if the limited range of motion around plaintiff's neck is accounted for plaintiff could still perform the job of order clerk. (Tr. 23.) However, there are at least two reasons why the fact that plaintiff could potentially perform work as an order clerk despite the functional limitations related to her neck does not render the ALJ's error harmless.

First, the vocational expert testified that there were only 27 order clerk jobs in Missouri, 1084 nationally, and that the relatively low number of available jobs would be "significantly reduced" for an individual with marked limitation in short-term auditory memory.  (Tr. 56, 60-61.)  Pursuant to applicable social security

regulations "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the claimant] live[s] are not considered 'work which exists in the national economy'." 20 C.F.R. §§ 404.1566(b), 416.966(b). Although the Eighth Circuit has never drawn a bright line establishing the number of jobs necessary to constitute a significant number of jobs existing in the economy, it has held that the trial judge should consider several factors including the level of the claimant's disability and the types and availability of work that the claimant could perform. *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988). The ALJ in this case did not expressly apply the factors from *Jenkins* and did not address the issue of whether the one job plaintiff potentially could perform exists in "significant numbers" in the economy. Given the relatively small number of order clerk jobs nationally (1,084) and locally (27), and given the fact that there is record evidence that plaintiff had marked limitation in short-term auditory memory, it is doubtful that the Commissioner has met its Step Five burden of demonstrating that there are a significant number of other jobs in the national economy that plaintiff can perform. *See Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012) (holding that at Step Five of the disability analysis the burden switches to the Commissioner to prove there are a significant number of jobs in the national economy).

Second, although it is not entirely clear, evidence in the record suggests that

plaintiff's learning disability, found by the ALJ to be a severe impairment, might preclude her from performing the job of order clerk. According to the vocational expert, the job of order clerk requires a language development level of two, which equates to a reading level of grades four through six. (Tr. 57.) However, plaintiff's education records reflect that when plaintiff was eighteen years old she underwent diagnostic testing which showed her to be a slow learner with significant deficits. For instance, she was found to have specific problems in short-term auditory memory; reading skills at the third grade level; and spelling skills at the fourth grade level. Other than the diagnostic testing performed when plaintiff was eighteen, there is little in the way of evidence of plaintiff's language and reading function, and the hearing decision does not address the issue. As such, the ALJ's alternative Step Five finding that there are other jobs existing in the national economy that plaintiff can perform is not supported by substantial evidence and does not render the ALJ's erroneous RFC determination harmless.

## VI. CONCLUSION

For all of the foregoing reasons, the ALJ's decision denying benefits is not based on substantial evidence on the record as a whole. Accordingly, the Court will remand the case for further administrative proceedings not inconsistent with this Memorandum and Order.

On remand, the Commissioner may wish to further develop the record by

requesting information from a treating physician or obtaining a consultative medical evaluation from a medical source examiner with respect to the severity of Plaintiff's impairments and her work-related capabilities in light of her medically determined impairments.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and this cause **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order.

A separate Judgment shall accompany this Memorandum and Order.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this  24th day of February, 2015.